[Civ. No. 49176. Second Dist., Div. Five. Feb. 1, 1978.]

EDWIN L. CARTY, Plaintiffs and Respondents, v.
CITY OF OJAI, Defendant and Appellant.

## Counsel

Thompson, Lyders, Laing & Childers and K. D. Lyders for Defendant and Appellant.

Ferguson, Regnier & Paterson and William E. Paterson for Plaintiffs and Respondents.

## Opinion

IBÁÑEZ, J.*—This is an appeal from a judgment by the court sitting without a jury. The plaintiffs (the Cartys) brought an action against the defendant, the City of Ojai, a municipal corporation (the city) praying that two city ordinances changing the zoning on the property owned by them (Carty property) be declared void and that the zoning existing on this property before the adoption of the ordinances be restored. The Cartys prevailed in the court below. The city has appealed.

### Statement Of The Case

The two ordinances proscribed the use of the Carty property as a shopping center. Their adoption had the effect of nullifying a sale of five acres to a party on condition that it could be used for a shopping center.

In 1965 the Carty property was outside the city limits and was zoned "commercial" under the county ordinance. A shopping center was a permissible use under this zoning. In that year, members of the city council considered that it was in the best interests of the city to annex the Carty property and other property in the same area. To accomplish this, the consent of the Cartys was required. The Cartys' consent was provisional upon the zoning of the property C-1. The result was the

*Assigned by the Chairperson of the Judicial Council.

annexation of the property into the city with a C-1 zoning, permitting use as a shopping center.

In 1971 the city rezoned the property to CPD (service commercial), thereby prohibiting its use for a shopping center.[1]

The trial court found the two ordinances void, basing its findings upon two principal grounds. (1) The rezoning was arbitrary and discriminatory; and (2) the city was estopped.

---

[1]"[1] The wisdom of the prohibitions and restrictions is a matter for legislative determination, and even though a court may not agree with that determination, it will not substitute its judgment for that of the zoning authorities if there is any reasonable justification for their action. [Citations.]

"[2] In passing upon the validity of legislation it has been said that 'the rule is well settled that the legislative determination that the facts exist which make the law necessary, must not be set aside or disregarded by the courts, unless the legislative decision is clearly and palpably wrong and the error appears beyond reasonable doubt from facts or evidence which cannot be controverted, and of which the courts may properly take notice.' [Citations.]

"[3] In considering the scope or nature of appellate review in a case of this type we must keep in mind the fact that the courts are examining the act of a coordinate branch of the government—the legislative—in a field in which it has paramount authority, and not reviewing the decision of a lower tribunal or of a fact finding body.

"[4] Courts have nothing to do with the wisdom of laws or regulations, and the legislative power must be upheld unless manifestly abused so as to infringe on constitutional guaranties. The duty to uphold the legislative power is as much the duty of appellate courts as it is of trial courts, and under the doctrine of separation of powers neither the trial nor appellate courts are authorized to 'review' legislative determinations.

"[5] The only function of the courts is to determine whether the exercise of legislative power has exceeded constitutional limitations.

"[6] As applied to the case at hand, the function of this court is to determine whether the record shows a reasonable basis for the action of the zoning authorities, and, if the reasonableness of the ordinance is fairly debatable, the legislative determination will not be disturbed. [Citations.]

"[7] The findings and conclusions of the trial court as to the reasonableness of a zoning ordinance are not binding on an appellate court if the record shows that the question is debatable and that there may be a difference of opinion on the subject. The appellate courts look beyond such determinations and consider in some detail the basic physical facts appearing in the record, such as the character of the property of the objecting parties, the nature of the surrounding territory, the use to which each has been put, recent trends of development, etc., to ascertain whether the reasonableness of the ordinance is fairly debatable. [Citations.]

"[8] Similarly, findings which relate to matters of opinion and judgment, such as that property is 'suitable only' for certain purposes, are not controlling. [Citations.] As we have seen, matters of this type lie within the discretion of the zoning authorities, and their action will be upheld if the question is fairly debatable." (*Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 461,462 [202 P.2d 38, 7 A.L.R.2d 990]; enumeration ours.)

It is axiomatic that legislative enactments, as here involved, are favored with a presumption of validity. (Evid. Code, § 664; *Orinda Homeowners Committee* v. *Board of Supervisors* (1970) 11 Cal.App.3d 768, 775 [90 Cal.Rptr. 88, 43 A.L.R.3d 880].)

STATEMENT OF FACTS

The City of Ojai is predominately a residential city with a population of approximately 6,000. The city is intersected from east to west by Ojai Avenue (State Highway 150). The "downtown" or central business district abuts Ojai Avenue and extends northward approximately three blocks. From east to west the central business district extends for five blocks from Canada Street on the east to Montgomery Street on the west, both of which enter Ojai Avenue at right angles.

Approximately one and one-half miles west of the central business district Ojai Avenue merges into Maricopa (State Highway 399) and another street to form a "Y." The Carty property is located approximately one-half mile northwesterly of the "Y" on the corner of Maricopa and Cuyama. It consists of approximately 25 acres of undeveloped land.

In 1963 the city adopted a "General Plan." This plan was in the form of a 41-page printed booklet. It noted, among other things, the experience of many cities where private commercial development has taken place in the outlying area rather than in the downtown or core area of the city and the results of such growth.

The plan also notes the deleterious effect if an outlying center were to be developed. It concluded with a summary emphasizing the importance of "strengthening the existing Town Center" by encouraging its development.

In 1968 the city amended the plan by adding thereto the "Central Business District Element" consisting of a report by the consulting firm of Hahn-Wise Associates, a map of the central business district and a traffic circulation plan.

In 1965 the city determined that it would be in its best interest to annex an area of county property bordering its city limits on the west, which included the property here involved.

In early 1965 public hearings were held. There were informal discussions between the Cartys and the city officials concerning annexation with retention of C-1 zoning. No written document was prepared confirming the understanding of the parties. Annexation was agreed to and accomplished and the property was zoned "C-1."

At the public hearings the conflict with the 1963 plan which disapproved of extending C-1 zoning was clearly recognized. However, the annexation of the West Ojai addition and the zoning of the property to "C-1" were finalized. Six years passed before the property was rezoned "CPD" following the planning commission's further consideration of the plan and zoning.

In 1968 the city employed planning consultants, with instructions to submit a plan for the development of the downtown business district. This study recommended that further development outside the downtown business district be curbed. Implementation of the study was thwarted for economic reasons. Efforts were made to redevelop the downtown business district and to create a parking district.

Also, the city undertook to widen Maricopa Road and provide utilities and draining facilities. In 1967 an assessment of approximately $51,000 was made against the Cartys, which was to be paid over a 15-year period.

In late 1969, Mr. Blalock, the building and zoning director and city manager, recommended that priority be given to putting into effect the central business district plan and the study of the "C-1" zoning on Maricopa Road. Throughout 1970 the planning commission discussed these subjects and the Hahn-Wise report of 1968 amending the general plan. Planning commission minutes of March 18 and April 1, 1970, refer to zoning studies of the properties westerly of the "Y" (West Ojai addition) and the minutes of October 28 of the same year referred thereto.

In January 1971 the Cartys sought to sell five acres, conditional upon the buyer obtaining the requisite permits for the construction of a shopping center. Mr. Rose, the buyer, was informed by the city manager that the proposed center was "permitted under the present zoning." A plot plan and building elevation drawings were submitted. On June 2, 1971, when Rose submitted his plans for approval, the planning commission voted to postpone the matter until July 7, 1971. Rose was informed that the commission was "studying" the question.

By early 1971, the city council was discussing whether it was probable that too much property was zoned "C-1."

On April 7, 1971, a committee of Dr. Kell and Mrs. Bjornstedt of the planning commission reported that the most important decision which

the commission was required to make was whether the "C-1" zoning on Maricopa Highway should be "retained, restricted or removed." At this meeting the commission requested the city staff to furnish information on property zoned "C-1," including the Carty property.

On July 7, 1971, the Rose request for plot plan approval was met with a recommendation that there be a zoning moratorium pending completion of studies by the commission and this was adopted by a three-to-two vote.

On July 13, 1971, the recommendation of the planning commission came before the city council, but the proposed ordinance adopting the recommendation failed to obtain the required four-fifths vote. At the next meeting (July 21) the city attorney informed the members that the commission had authority to recommend a zone change after conducting a public hearing; this was accomplished on August 4. The commission then adopted, by a three-to-two vote, a recommendation that all undeveloped "C-1" property on Maricopa Road, including that here involved, be rezoned "CPD," which zone did not permit retail-commercial use. The general plan and especially the Hahn-Wise report were cited as the principle reason for the change.

On August 24 a public hearing was held to consider the commission's recommendation. It was pointed out that there was a need to complete studies on commercial zoning before any further development was allowed. The recommendations were adopted and the properties rezoned through approval of five ordinances. Final adoption took place on September 21. A planning commission report was returned within 90 days and confirmed the action taken in the change of zoning on Maricopa Road from "C-1" to "CPD." Thereafter, the five ordinances were upheld in a referendum election.

Mr. Rose terminated the escrow for the purchase of the property and this litigation followed.

### DISCUSSION

We have concluded that there is no basis in law nor in fact to support the judgment which adjudges the two ordinances void and restores the original zoning on the Carty property to retail-commercial or "C-1." We find that the city properly exercised its legislative power in adopting the

two ordinances in question and that it was not estopped from making the zone change.

■ 1. *The City Properly Exercised Its Legislative Powers in Adopting the Ordinances.*

The court found that the rezoning of the Carty property was "not motivated by a valid zoning objective but was designed to frustrate development of the proposed shopping center" and that it was "an arbitrary and discriminatory use of the city's zoning power." It also found that rezoning of the Carty property from "C-1" to "CPD" would not "further any valid zoning objective."

Findings were also made concerning the time period from the date of the annexation of the Carty property in 1965 to the date in 1971[2] when the property was rezoned, as follows: (1) There were no changes in the use patterns of the land in the city during this period; (2) In 1971 there was a preexisting surplus of property in the city zoned "CPD"; (3) No new "planning concepts" were developed by the city during the stated period; (4) All the reasons given in 1971 in support of the adoption of the two ordinances in questions which rezoned the Carty property from "C-1" to "CPD" were considered and rejected by the city council when, in 1965, it annexed and zoned the Carty property "C-1."

In reviewing a zoning decision made by a legislative body, we must be guided by certain basic principles. (Fn. 1, *ante.*)

II. *The Rezoning Was Not Arbitrary Nor Discriminatory.*

Cartys do not challenge the stated principles of judicial review but argue that they do not apply "where the issue is arbitrary and discriminatory rezoning," citing *G & D Holland Construction Co.* v. *City of Marysville* (1970) 12 Cal.App.3d 989, 994 [91 Cal.Rptr. 227]. They also assert that the nullification of the legislative determination to rezone was not based upon insufficient or conflicting evidence. It is the lack of "any

---

[2]As stated in *Miller* v. *Board of Public Works* (1925) 195 Cal. 477, 496 [234 P. 381, 38 A.L.R. 1479]: "It is a matter of common knowledge that a zoning plan of the extent contemplated in the instant case cannot be made in a day. Therefore, we may take judicial notice of the fact that it will take much time to work out the details of such a plan and that obviously it would be destructive of the plan if, during the period of its incubation, parties seeking to evade the operation thereof should be permitted to enter upon a course of construction which might progress so far as to defeat in whole or in part the ultimate execution of the plan."

real basis" for the rezoning that "sheds light on the City's purpose" as does the "state of mind of the City officials involved," argue respondents. These factors and the evidence support the conclusion that the rezoning was done to block the development of the proposed shopping center; hence, the legislative action was arbitrary and discriminatory and therefore void.

In support of the trial court's conclusion that the rezoning was arbitrary and discriminatory because it was "purely and simply to prevent the construction of the proposed shopping center," Carty stressed the importance of certain selective items of evidence, i.e., (1) that the city took little or no action to put into effect the general plan adopted in 1963, and modified by more specificity in 1968, which recommended that no shopping centers, like the one proposed, be permitted; (2) that one of the reasons given by the city for rezoning the Carty property was that the "studies" in zoning had not been completed; this, respondents assert, was a "make-weight" lacking in good faith to obscure the real purpose which was to frustrate the construction of the proposed shopping center; (3) that at the time of rezoning there was no need for additional property zoned "CPD"; (4) that no significant changes in land use in the city had occurred in the six years which passed from 1965 when the Carty property was annexed and zoned "C-1" and 1971 when the property was rezoned to "CPD."

These items acquire meaning only in the contextual setting of the principal facts hereinbefore recited. As we have noted, the Carty property was not singled out for discriminatory treatment. All property along Maricopa Road which was undeveloped and zoned "C-1" was rezoned "CPD."

From a review of the entire record, it is evident that there was a rational basis for the action taken in rezoning. It follows then that the action was neither arbitrary nor discriminatory. The trial court disregarded the basic principles applicable as noted. (*Lockard* v. *City of Los Angeles, supra,* 33 Cal.2d 453.)

*Sunset View Cemetery Assn.* v. *Kraintz* (1961) 196 Cal.App.2d 115 [16 Cal.Rptr. 317] does not support respondent. There petitioner cemetery association applied to the county for a permit to construct a crematory and mortuary. It was denied on the basis of a narrow interpretation of the meaning of the words "cemetery purposes." The cemetery association filed a petition for a writ of mandate to compel the issuance of the

building permit. On the day that the order issuing the writ was made another application for a building permit was filed by the association. The very next day the county adopted an ordinance as an "emergency measure" prohibiting the contemplated use. The association's response was immediate. It filed a second petition for a writ of mandate which was granted.

Only two issues decided in *Sunset, supra,* are pertinent here. The first was that the trial court correctly held that there was no basis for the enactment of the ordinance as an "emergency measure"; the only "emergency" was the desire of the legislative body to nullify the court order. The second was that the trial court properly held that there was no reasonable basis for the adoption of the ordinance and that it was therefore discriminatory. "Nothing in the record in the instant case indicates that the ordinance formed any part of a zoning plan or that appellant had even contemplated the ordinance before the trial court's first decision; the enactment of the ordinance stemmed from the county's attempt to frustrate respondent's plans. The generality of the language of the ordinance does not conceal its single, realistic purpose: the prohibition of respondent's mortuary. As amicus curiae in behalf of respondent states, 'Such an isolation of one party as the object of the Board's legislative action is a plain discrimination; one that cannot survive testing under accepted principles of constitutional law. [Citation.]' " (*Sunset View Cemetery Assn.* v. *Kraintz, supra,* 196 Cal.App.2d 115, at pp. 123-124.)

As distinguished from *Sunset,* here it is established that long before the adoption of the two rezoning ordinances the officials acted to encourage and promote the orderly growth and development of their community in the manner recommended by the general plan. The adoption of the two rezoning ordinances is consonant with that purpose.

The issue decided in *G & D Holland Construction Co.* v. *City of Marysville, supra,* 12 Cal.App.3d 989, was the inappropriate use of the summary judgment procedure for settling a controversy having triable issues of fact.[3]

---

[3] "The issues framed by the pleadings evoked judicial review more intense than that posed by a generalized exercise of police power. They called upon the trial court to determine whether the city council's action represented a discriminatory exercise of legislative power or a choice between legitimate environmental values. In its inquiry the court was not limited to the face of the ordinance, but could receive evidence of its immediate purpose, its ultimate objective and of the circumstances attending its adoption. [Citations.] Seldom may such an inquiry be pursued through the brusque

In the case before us, unlike *Holland,* the issues of fact were fully ventilated and not stifled in the confinement of a "brusque summary judgment procedure." (*Id.*)

Other cases cited by respondents have been considered and likewise found not controlling. We therefore conclude that the record does not support the findings and conclusions of the trial court that the rezoning ordinances had no rational support and were therefore arbitrary and discriminatory.

### III *The City Was Not Estopped From Adopting the Rezoning Ordinances*

#### A. *The Doctrine of Equitable Estoppel—In General*

■ "The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment. The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 488-489 [91 Cal.Rptr. 23, 476 P.2d 423].)

"*Mansell* made it clear that, although estoppel may be applied against the government when justice and right require it, the doctrine is inapplicable if it would result in the nullification of a strong rule of policy adopted for the benefit of the public. (3 Cal.3d at p. 493.)" (*Strong* v. *County of Santa Cruz* (1975) 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d 264].)

---

summary judgment procedure—not, at least, where the complainant shows a justiciable interest. Rather, the inquiry calls for the refined sifting process of a trial; for cross-examination to probe and strip the pretensions of witnesses, lay and expert; for the creation of a record permitting findings in terms of genuine purpose and effect, as well as meaningful appellate review of those findings. The city's affidavits failed to establish validity of the interim rezoning ordinance as a matter of law. The trial court erred by granting a summary judgment which prevented petitioners from producing evidence of discriminatory purpose aimed at the single square block and their particular project." (*Id.* at p. 996.)

## B. *Equitable Estoppel Against a Government Entity*

█ The doctrine of equitable estoppel is applied to a private party as it is to the government. But when the latter is sought to be estopped there are additional considerations which must be taken into account and resolved before it is determined that the doctrine can be invoked. These considerations are stated in *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, at pages 496-497 [91 Cal.Rptr. 23, 476 P.2d 423]: ". . . After a thorough review of the many California decisions in this area, as well as a consideration of various out-of-state decisions, we have concluded that the proper rule governing equitable estoppel against the government is the following: The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel."

*Mansell* is recognized as fully expressive of the principles existing in the application of equitable estoppel against the governmental entity. It would avail us nothing to reword the distinction therein articulated between *County of San Diego* v. *Cal. Water etc. Co.* (1947) 30 Cal.2d 817 [186 P.2d 124, 175 A.L.R. 747] where the county was held not to be estopped and *City of Imperial Beach* v. *Algert* (1962) 200 Cal.App.2d 48 [19 Cal.Rptr. 144] where the city was estopped. On the record before us we discern no compelling " 'exceptional conditions in which estoppel against a governmental agency is justified and should be applied.' " (*Mansell, supra,* 3 Cal.3d 462, 496.)

## C. *Estoppel in Its Application to a Government Entity*

While the doctrine may be applied against the government " 'where justice and right require it' . . . [it] will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public, . . .' [Citation.] The tension between these twin principles makes up the doctrinal context in which concrete cases are decided." (*Mansell, supra,* at p. 493.)

█ We must, therefore, assess the relative merits of these competing contentions. On the one hand is the contention of the Cartys, who have lost a purchaser because the city changed the zone classification of their

property. On the other, is that of the city, which asserted its legislative right and duty to plan, control and restrict the growth and development of the city by zoning.

The reliance of the Cartys on the conduct of the city in the case before us has most tenuous predicates. No representations were made by any public official from the city as to the length of the time that the zone "C-1" would continue. Indeed, it remained for six years following the annexation of the Carty property by the city.

The record shows that Carty, with whom the city officials spoke on the subject of annexation, had been in public life for approximately 18 years. He served as Mayor of the City of Oxnard and as a member of the Board of Supervisors of Ventura County. With this background, a justifiable inference to make would be that he had knowledge of the proscriptions by law relating to legislative action.

■ " 'The police power being in its nature a continuous one, must ever be reposed somewhere, and cannot be barred or suspended by contract or irrepealable law. It cannot be bartered away even by express contract.' [Citations.] It is to be presumed that parties contract in contemplation of the inherent right of the state to exercise unhampered the police power that the sovereign always reserves to itself for the protection of peace, safety, health and morals. Its effect cannot be nullified in advance by making contracts inconsistent with its enforcement. [Citations.]" (*Mott* v. *Cline* (1927) 200 Cal. 434, 446 [253 P. 718].)

"We agree with this aspect of the trial court's conclusion. Land use regulations, such as the Act, involve the exercise of the state's police power (*Miller* v. *Board of Public Works, supra,* 195 Cal. 477, 486-489), and it is settled that the government may not contract away its right to exercise the police power in the future. [Citations.]" (*Avco Community Developers, Inc.,* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 800 [132 Cal.Rptr. 386, 553 P.2d 546].)

■ It is also reasonable to assume that Carty had knowledge of the fact that a government entity has the right to modify its zoning. (*Orinda Homeowners Committee* v. *Board of Supervisors, supra,* 11 Cal.App.3d 768, 776.) Based also on Carty's background in public life, it is doubtful that his reliance on the duration of the "C-1" on his property was justified, i.e., that it should remain "indefinitely, barring some funda-

mental change in the existing land uses in the immediate area," as the findings indicate.

Based upon the entire record and the cited precedents, we conclude that the claimed "injustice" does not reach those proportions which would justify invoking the doctrine against a government entity in the exercise of its legislative powers.

We turn to the question of whether the record supports the conclusion that the doctrine of equitable estoppel should be invoked against the city under the circumstances here presented. Since 1963, when the general plan for the development of the city was adopted, the public officials have acted with steadfast purpose to put it into effect. They have sought resolutely to overcome many obstacles standing in the way in the fulfillment of that purpose. In the exercise of their legislative power of zoning they have attempted to direct and control the growth and development of the city to make it conform to the general plan. The adoption of the two rezoning ordinances here in question was a major step in that direction. It was a fulfillment of a responsibility by the public officials of the city. We conclude that to invoke the doctrine of estoppel against the city under the facts here before us would nullify and frustrate " 'a strong rule of policy, adopted for the benefit of the public, . . .' " (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 493, quoting *County of San Diego* v. *Cal. Water etc. Co., supra,* 30 Cal.2d 817, 829, 830.)

The rationale of *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 795 [132 Cal.Rptr. 386, 553 P.2d 546], seems to us to compel the result we reach herein: "The contention that Avco was entitled to a building permit because the county would have been compelled to issue it upon mere application has no merit. The Orange County Building Code (§ 302(a)) provides that a building permit may not issue unless the plans conform not only to the structural requirements of the code but to 'other pertinent laws and ordinances.' This provision codifies the general rule that a builder must comply with the laws which are in effect at the time a building permit is issued, including the laws which were enacted after application for the permit. (*Brougher* v. *Board of Public Works* (1928) 205 Cal. 426, 435 [271 P. 487]; see *Russian Hill Improvement Assn.* v. *Board of Permit Appeals* (1967) 66 Cal.2d 34, 39 [56 Cal.Rptr. 672, 423 P.2d 824]; cf. *Miller* v. *Board of Public Works* (1925) 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479]; and see cases collected in 50 A.L.R.3d 596, 602.) A landowner which has not even applied for a permit cannot be in a better position merely because it

had previously received permission to subdivide its property and made certain improvements on the land. [Fn. omitted.]"

The judgment is reversed.

Stephens, Acting P. J., and Hastings, J., concurred.