[No. G010228. Fourth Dist., Div. Three. May 11, 1992.]

HAROLD L. WILSON et al., Plaintiffs and Appellants, v.
CITY OF LAGUNA BEACH, Defendant and Appellant.

COUNSEL

Morrison & Foerster, Philip E. Smith, David A. Delman and Theresa Barta-Vavrock for Plaintiffs and Appellants.

Rutan & Tucker, Philip D. Kohn and Hans Van Ligten for Defendant and Appellant.

OPINION

SILLS, P. J.—

I

More than a decade ago the state Legislature declared the supply of housing in California was insufficient to meet demand and the imbalance was likely to become worse in the foreseeable future.[1] In the space of two pages, the Witkin treatise on California law cites no less than 19 different sets of laws and programs as "illustrative" of the Legislature's efforts to both increase the housing available to Californians and help make it affordable.[2]

One of California's more "innovative" efforts is section 65852.2 of the Government Code[3]—sometimes referred to as the "granny flat" statute.[4] That statute encourages local governments to enact their own ordinances allowing and regulating "second units" in single-family and multifamily

---

[1]Statutes 1979, chapter 1207, section 1, page 4738.

[2]4 Witkin, Summary of California Law (9th ed. 1987) Real Property, section 54, pages 274-275.

[3]The description "innovative" was made in spring 1982 by economist David Shulman in a letter to the Senate Local Government Committee concerning the genesis of the statute, Senate Bill No. 1534.

[4]Government Code section 65852.1 might also lay claim to being a "granny flat" statute. That section makes it easier for cities to grant zoning variances for "dwelling unit[s]" which are intended to be occupied by persons 62 years of age or over. It does this by overriding Government Code section 65906, which allows zoning variances to be granted "only" on "special circumstances applicable to the property." Section 65852.1, however, merely *allows*

zones where they otherwise would be prohibited. If the local governments do not enact such an ordinance, then they *must* grant a "conditional use permit" for any second units which meet the requirements enumerated in the statute. (Gov. Code, § 65852.2, subd. (b).)

It is what those requirements do not include that prompted numerous local governments to oppose the granny flat statute prior to its being signed into law by Governor Brown in September 1982. Specifically, they do not include assurance of adequate parking. As the statute is worded, if an existing second unit meets the requirements, the local government must grant the permit even if parking for the unit is inadequate.

It is thus not surprising that cities where finding a parking space can be the highlight of one's day were less than enthusiastic about implementing the granny flat statute. This case arises out of the efforts of one such city, Laguna Beach, which, as the record shows, employed a number of artful bureaucratic devices to circumvent the statute in the time period before the adoption of its own (and, of course, somewhat stricter) ordinance—the interval when the city was required to process the requested permits under the statute.

During that period of time, in the words of the trial judge, the city "actively discouraged" and "misled" potential applicants. Nevertheless, the trial court did not grant the plaintiffs, a class of similarly situated owners of second units, what they requested—a writ of mandate ordering the city to review applications under the criteria prescribed by the statute rather than the new ordinance. The trial court reasoned that a city official cannot, in effect, repeal a zoning ordinance by administrative action, i.e., by granting approval for a project otherwise prohibited by that ordinance. The judge reasoned that constituents should not have to suffer crowded streets because of the mistakes of city officials.

But the fundamental value judgment at stake here—a choice between housing and parking—was made by the Legislature in favor of housing. *It* decided the benefits of the additional housing provided by second units outweigh the costs of exacerbating local parking problems. Accordingly, we must reverse and order the trial court to grant the writ.

## II

Before 1988, South Laguna Beach was not part of the city of Laguna Beach, but of unincorporated Orange County. As the idea of annexation to

cities to do something they might not otherwise be able to do. Unlike (as we shall see) section 65852.2, it does not *require* cities to do something they do not want to do. In any event, we refer to section 65852.2 as "the granny flat statute" in this opinion.

the city circulated, a group known as the South Laguna Civic Association became concerned about the proliferation of what it labeled "illegal" second units in the area—units which, in its opinion, were not permitted by the single-family zoning laws. (In reality, as explained in section VI of this opinion, there is no way of knowing whether many of these units are "illegal" or not; pertinent county records have been lost. Moreover, as also explained in the same section, whether the units were permitted by local zoning laws or not makes no difference under the granny flat statute.) Members of the association sought and obtained a promise from the Laguna Beach City Manager that if the city were to annex the territory, it would be aggressive in "abating"[5] these second units.

The area was annexed effective December 31, 1987. City officials were determined to crack down on "illegal" second units. One such second unit was owned by Harold Wilson. Within a month after annexation, Wilson received a letter from the city's "code compliance technician" (bureaucratese for "city inspector") telling him his property violated the South Laguna Specific Plan land-use regulations which limited each parcel to one single-family dwelling unit. (The city sent over 100 similar letters to other second unit owners as well.)

Unlike most homeowners, Wilson was aware of the granny flat statute, and asked the city to provide him with the necessary forms to obtain a conditional use permit under it. The compliance technician then sent Wilson a letter telling him that if he had any questions about the granny flat statute he should contact a certain associate city planner. It was the practice of the compliance technician to discuss the possibility of a conditional use permit *only* if the owner first inquired about the matter.

Wilson then met with the compliance technician and the associate city planner on March 18, 1988, and obtained an "application for conditional use permit form" from the compliance technician. He was also given a form entitled "Submittal Requirements—South Laguna Specific Plan Area" (submittal form) and told he would have to submit the information called for in that form as well as show he had one additional uncovered parking space for his second unit. This was in accord with the city's policy that all applicants for conditional use permits had to establish they had one additional parking space for the unit.

The submittal form began: "The items listed below are required to be submitted to the City of Laguna Beach in order to begin processing of

---

[5]In the parlance of local government, to "abate" property is to do whatever is necessary to make it conform to applicable local codes.

building projects in the South Laguna Specific Plan area. This information must be properly completed in its entirety before plans will begin to be processed. It is important that applicants observe this closely, as incomplete and/or inadequate submittals will be returned and processing suspended until corrections are made." Then followed a list of items, including a building permit information form, a mailing list prepared by a professional listing agency or title company, a copy of assessor's parcel maps, and four sets of plans which themselves had to meet certain standards, among which were listing the botanical names of all "plant material." The city's policy was that an applicant for a conditional use permit for a second unit had to supply this information or it would not consider or process the application. The submittal form made no mention of the granny flat statute.

On April 7, Wilson mailed the application. Twenty days later the associate planner returned it and stated in the cover letter that the city staff would "be unable" to process the application without the information required by the submittal form. Wilson never provided *that* information.

Meanwhile, the issue of second units was a hot topic in the city. In the early months of 1988, several "town hall" meetings were held on the subject. These culminated in a city council meeting held April 5, 1988, at which the council adopted an "amortization" program. The program required owners to "agree" to phase out their units over varying periods of time, depending on the condition of the property, the nature of the second unit, and whether the owner or tenant was a senior citizen. If the owners did not agree, they faced *immediate* abatement.

On April 22, the city mailed a "fact sheet" concerning this phase-out program to all residents of South Laguna. The fact sheet told South Laguna residents they had until July 1 to "abate" their illegal second units or agree to join the city's phase-out program. The fact sheet also made an oblique reference to the granny flat statute: it mentioned the city council had asked the city manager to "analyze the provisions of Government Code Section 65852.2 which establishes a procedure for legal allowing [*sic*] second units in a single family zone." It then stated the procedure "may offer a means to legalize some of the existing units." A "report" on the subject would be given the city council in "early 1989."

In May, the city held a "public workshop" regarding its phase-out program. At the workshop the city manager said an owner could apply for a conditional use permit, *but would be required to meet city parking standards*. The application fee was about $300. If the owner could not meet those standards, the owner could apply for a variance. The fee for that was $1,200.

But even then there was "no guarantee" the city would grant the permit because "there was no way to receive or process a conditional use permit at that time," and therefore, the manager lamented, "there really wasn't much use in even bothering to try . . . ."

In June 1988, Wilson received a letter from a deputy city attorney telling him to agree to the city's phase-out program or be "subject to abatement." The letter said "[a]ny illegal units not part of the amortization program, as evidenced by a signed agreement with the City, will be subject to abatement as soon as they are identified by the City."

In October, Wilson received a letter from the compliance technician again telling him to sign a phase-out agreement or "immediate abatement" of his "illegal unit [would] be required." Approximately 50 to 100 such letters were mailed to second unit owners.

In November, Wilson got a "final notice" from the technician saying the same thing, but adding that if he failed to comply, the matter would be forwarded to the city attorney for further action. The city also sent approximately 50 of these letters out to second unit owners.

Also in November, a paralegal working for an attorney for another second unit owner, Barbara Love, wrote to the compliance technician and asked about the feasibility of legalizing her second unit. A deputy city attorney wrote back, stating, among other things, "The only possible method of legalizing the structure would be for Ms. Love to seek an amendment of the Zoning Code to permit a duplex on her site." The letter did not mention the granny flat statute, but did say that "should Ms. Love decide not to participate in the amortization program, the second unit must be abated immediately." Nor did the letter mention any county ordinance allowing second units which the city might have adopted upon annexation.

In December, Wilson and Donald Spencer[6] filed this lawsuit on behalf of themselves and all others similarly situated, asking the trial court to order the city to accept and process conditional use permits in accordance with the granny flat statute. In March 1989, the trial court approved the suit as a class action, the class consisting of all persons who own, in South Laguna, a single-family dwelling with a second unit within the meaning of Government Code section 65852.2, subdivision (e)(3), as long as the unit had not already been determined to be a legal second unit.

---

[6]Spencer's experience differed slightly from Wilson's. After Spencer's property was inspected by the compliance technician, she said that if Spencer did not sign a phase-out agreement the city would undertake to "abate" the second unit immediately. Spencer ended up signing a phase-out agreement.

In June 1989, before the case could come to trial, the city adopted an ordinance allowing and regulating second units, Ordinance No. 1175. The new ordinance set up stricter standards for second units than the granny flat statute, including compliance with local parking regulations.

The case was heard by the court in August 1990. By this time the city had *never* accepted as "complete" a single application for a conditional use permit. After the trial, the court prepared a notice of decision, making several determinations and findings:

—There was a county ordinance in existence before the area was annexed which had established certain criteria for allowing second units.[7] However, this ordinance was invalid as it conflicted with the South Laguna Specific Plan. Accordingly, from the time of annexation until the adoption of Ordinance No. 1175 in June 1989, the city had no ordinance allowing and regulating second units, and therefore the granny flat statute controlled the criteria for conditional use permits for second units.

—Under the granny flat statute, the city was not justified in requiring applicants to show they could provide additional parking.

—It was "clear" that the city "did actively discourage Conditional Use Permit applications" prior to the adoption of Ordinance No. 1175. "The class was misled and discouraged by the conduct of the [c]ity from pursuing" such applications.

—Even though the city misled and discouraged applications, the city still should not be estopped from enforcing its new ordinance (for a period of time corresponding to the time the city misled the class) so as to give class members a chance to submit applications under the granny flat statute. Estopping the city in this case would only "harm the public rather than the [c]ity." Accordingly, the court denied the request for a writ of mandate.

The second unit owners appealed from the denial of their request for a writ of mandate. The city cross-appealed.

The cross-appeal is from three portions of the judgment: (1) finding that the city misled and discouraged second unit owners from applying for conditional use permits; (2) interpreting the granny flat statute to mean that

---

[7]This ordinance was section 7-9-146.5 of the Orange County Zoning Code. This provision, consisting of two paragraphs, sets out a procedure for allowing second units on parcels zoned for single-family units. Among the requirements, however, is "[o]ne additional uncovered parking space." We refer to section 7-9-146.5 as the "old county ordinance" to differentiate it from the "new city ordinance" adopted in June 1989.

it does not allow a local jurisdiction to require additional parking; and (3) determining the old county ordinance did not apply to the area prior to the adoption of the new city ordinance.

If these issues are considered in reverse order, they form a logical concatenation of ideas. We consider first whether the old county ordinance was in effect in South Laguna after annexation and before the adoption of the new city ordinance. If it was not, and therefore the granny flat statute was, we must next determine whether the granny flat statute allowed the city to require additional parking for second units. If not, we must next decide whether the findings concerning the city's misconduct may be sustained: was it true the city "misled" and "actively discouraged" second unit owners from applying for what they had the right to apply for? Finally, if the misconduct findings are true, we must ascertain whether the second unit owners are entitled to their requested writ.

III

The record clearly shows the city never seriously thought the old county ordinance governed South Laguna.

—At the public workshop the city manager told a group of second unit owners the "city had no second unit ordinance."

—The letter of the deputy city attorney to Barbara Love's paralegal in November 1988 stated the *only possible* way for her to "legalize" her property was an amendment of the zoning code. The letter made no mention of the availability of a conditional use permit under the old county ordinance.

—In December 1988, in response to the second unit owners' request for a temporary restraining order, the city candidly admitted that it had not adopted an ordinance pursuant to either subdivision (a) or subdivision (c) of the granny flat statute, and therefore the "provisions of subdivision (b) apply."

—Two weeks later, in opposition to a motion for a preliminary injunction, the city told the court substantially the same thing: "The City has not adopted an ordinance pursuant to subdivisions (a) or (c) of Section 65852.2. Subdivision (b) contains the mandated criteria for approval if the City has not adopted an ordinance pursuant to subdivisions (a) and (c) governing second units in single-family and multifamily residential zones."

—The position was not only reiterated a week later in the city's points and authorities in support of a demurrer to the complaint, but expressed as

something the city *intended* to adhere to in the future: "In essence, under [the granny flat] statute, a city has three options. It can outlaw all second units if certain findings can be made (subd. (c)); it can adopt an ordinance establishing various criteria for the creation of second units (subd. (a)); or it may do neither and follow the State-prescribed procedure (subd. (b)). The City of Laguna Beach has not adopted an ordinance as of this date [December 29, 1988] and, therefore, it *will apply* the criteria in subdivision (b), unless it adopts an ordinance within 120 days of acceptance of a complete application." (Italics added.)

■ In light of this history of its position on this question, the city would not only appear to be playing fast and loose with its residents but with the courts as well. After having told the trial court in December 1988 that it had not adopted a second unit ordinance, it now tries to tell us that, lo and behold, it had.

We are not amused. If the city should be estopped from anything, it is from asserting such a position. The issue here is not simply a question of the city taking a particular legal position and then discovering it was in error. Rather, the issue goes to the city's conduct vis-à-vis the second unit owners. Prior to the new city ordinance, the city had no intention of processing their applications for conditional use permits under the old county ordinance, or for that matter, under any other ordinance. The city's position, as the record shows, was consistently one of "agree to our phase-out plan or else." We do not think the city should now be allowed to take a position diametrically opposed to the one which prompted this litigation in the first place.

In any event, the city's contention is, as Yogi Berra might have said, meritless on its merits. There is no question that the South Laguna Specific Plan did not allow second units.[8] When the county adopted the South Laguna Specific Plan, it adopted that plan as the "superseding" land-use regulations in the area. (See Orange County Board of Supervisors Res. No. 83-507, dated Apr. 6, 1983.) The logical conclusion from this is that the County Specific Plan was *intended* to prevail over any inconsistent county zoning ordinances, including any ordinances which might have allowed second units.

Additionally, in light of the city's uniform position up to the time of this lawsuit—that it had no applicable second unit ordinance—any doubt should be resolved against it on the point. (See *Castaneda v. Holcomb* (1981) 114 Cal.App.3d 939, 945 [170 Cal.Rptr. 875] [noting city officials had "uniformly followed" plaintiffs' interpretation of city charter provisions].)

---

[8]In its respondent's brief, the city concedes the point "is really not subject to dispute."

## IV

Because the granny flat statute and not the old county ordinance applied, we must determine whether the city was within its rights to require that applicants show additional parking. This requires us to consider the text of the granny flat statute.

The city correctly understood the basic structure of the statute in the papers it filed in December 1988. The statute, in essence, gives a city three options. It can outlaw all second units if certain findings can be made (subd. (c)),[9] adopt its own ordinance establishing various criteria for the creation of second units (subd. (a)),[10] or do neither and follow the state-prescribed procedure (subd. (b)).[11]

---

[9]Government Code section 65852.2, subdivision (c):

"No local agency shall adopt an ordinance which totally precludes second units within single-family and multifamily zoned areas unless the ordinance contains findings acknowledging that the ordinance may limit housing opportunities of the region and further contains findings that specific adverse impacts on the public health, safety, and welfare that would result from allowing second units within single-family and multifamily zoned areas justify adopting the ordinance."

[10]Government Code section 65852.2, subdivision (a):

"Any local agency may, by ordinance, provide for the creation of second units in single-family and multifamily residential zones consistent with all of the following provisions:

"(1) Areas may be designated within the jurisdiction of the local agency where second units may be permitted.

"(2) The designation of areas may be based on criteria, which may include, but are not limited to, the adequacy of water and sewer services and the impact of second units on traffic flow.

"(3) Standards may be imposed on second units which include, but are not limited to, parking, height, setback, lot coverage, architectural review, and maximum size of a unit.

"(4) A local agency may find that second units do not exceed the allowable density for the lot upon which the second unit is located, and that second units are a residential use that is consistent with the existing general plan and zoning designation for the lot.

"(5) The second units created shall not be considered in the application of any local ordinance, policy, or program to limit residential growth.

"(6) A local agency may establish a process for the issuance of a conditional use permit for second units."

[11]Government Code section 65852.2, subdivision (b), provides in part:

"When a local agency which has not adopted an ordinance governing second units in accordance with subdivision (a) or (c) receives its first application on or after July 1, 1983, for a conditional use permit pursuant to this subdivision, the local agency shall accept the application and approve or disapprove the application pursuant to this subdivision unless it adopts an ordinance in accordance with subdivision (a) or (c) within 120 days after receiving the application. Notwithstanding Section 65901, every local agency shall grant a special use or a conditional use permit for the creation of a second unit if the second unit complies with all of the following:

"(1) The unit is not intended for sale and may be rented.

"(2) The lot is zoned for single-family or multifamily use.

"(3) The lot contains an existing single-family dwelling.

■ Under the state-prescribed procedure, a conditional use permit must be granted if the second unit property meets certain criteria. There is clearly no *express* requirement of additional parking in the criteria in Government Code section 65852.2, subdivision (b).

The city, however, claims that subsection (7) of subdivision (b) of Government Code section 65852.2 states an *implied* exception: "Any construction shall conform to height, setback, lot coverage, architectural review, site plan review, fees, charges, and *other zoning requirements* generally applicable to residential construction in the zone in which the property is located." (Italics added.) According to the city, the phrase "other zoning requirements" impliedly includes the additional parking.

The city omits to mention, however, that parking is *expressly* mentioned in Government Code section 65852.2, subdivision (a), the portion of the granny flat statute governing a city's own ordinance allowing and regulating second units.[12] Where "the Legislature has employed a term or phrase in one place and excluded it in another, it should not be implied where excluded." (*Phillips* v. *San Luis Obispo County Dept. Etc. Regulation* (1986) 183 Cal.App.3d 372, 379 [228 Cal.Rptr. 101].) The omission of any express reference to parking in subdivision (b), when there is such a reference in subdivision (a), is therefore dispositive.

Moreover, to the degree there is any ambiguity, we may consult the legislative history of the granny flat statute. (See *Long Beach Police Officers Assn.* v. *City of Long Beach* (1988) 46 Cal.3d 736, 743 [250 Cal.Rptr. 869, 759 P.2d 504]; *Sand* v. *Superior Court* (1983) 34 Cal.3d 567, 570 [194 Cal.Rptr. 480, 668 P.2d 787].) That legislative history teaches but one lesson.

---

"(4) The second unit is either attached to the existing dwelling and located within the living area of the existing dwelling or detached from the existing dwelling and located on the same lot as the existing dwelling.

"(5) Any increase in the floor area of an attached second unit shall not exceed 30 percent of the existing living area.

"(6) The total area of floor space for a detached second unit shall not exceed 1,200 square feet.

"(7) Any construction shall conform to height, setback, lot coverage, architectural review, site plan review, fees, charges, and other zoning requirements generally applicable to residential construction in the zone in which the property is located.

"(8) Local building code requirements which apply to detached dwellings, as appropriate.

"(9) Approval by the local health officer where a private sewage disposal system is being used, if required."

[12]See subsection (3): "Standards may be imposed on second units which include . . . parking." See also subsection (2): "[C]riteria . . . may include . . . the impact of second units on traffic flow."

As originally introduced in February 1982, Senate Bill No. 1534 contained this provision: "In approving a second residential unit pursuant to subdivision (a) [then worded to require approval of second units if certain requirements were met], a local government shall not impose, as a condition of approval, requirements which are more stringent than either of the following: [¶] (1) More than one additional parking space above existing zoning requirements where the creation of the second residential unit involves a net increase in living area of two bedrooms or less."

The bill was amended after its introduction, but still contained a provision allowing cities to take parking into account: "[n]ot more than one additional off/street parking space shall be required for new residential units which involve a net increase in living area of two bedrooms or less."

On March 31, 1982, however, economist David Shulman wrote the Senate Local Government Committee to argue that Senate Bill No. 1534 did not "go far enough" because it did not protect against additional parking requirements for certain small units. On April 12, 1982, the bill was amended, deleting, among other things, the provision allowing local governments to demand additional parking.

The rejection of a specific provision contained in an act as originally introduced is "most persuasive" that the act should not be interpreted to include what was left out. (*Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 607 [45 Cal.Rptr. 512]; see also *Stroh* v. *Midway Restaurant Systems, Inc.* (1986) 180 Cal.App.3d 1040, 1055 [226 Cal.Rptr. 153] ["When the Legislature rejects language from a bill which was part of it when it was introduced, it should be construed according to the final version."].) In this regard, we also note that many local governments opposed the bill after it was amended, precisely because it did not allow additional parking to be considered.[13]

The clincher, at least as it relates to this case (involving, as it does, only plaintiffs who *already* own second units) is the three letter word "any." One

---

[13]From a letter of the Orange County Division of the League of California Cities to Senator Henry Mello, dated June 21, 1982: "This bill would not even allow cities to disapprove second units on the basis of traffic impact or inadequate parking spaces." From a letter of the Peninsula Division of the League of California Cities to Senator Alfred Alquist, dated July 13, 1982: "The bill does not permit cities and counties to consider the traffic and parking impacts of second units." From a letter of the legislative representative of the city of San Jose to Senator Henry Mello, dated August 2, 1982: "Our primary opposition to SB 1534 is that it does not allow cities the authority to deny second units on the basis of the traffic impact or inadequacy of parking . . . ." From a letter of the city manager of Stockton to Assemblyman Jim Costa, dated July 28, 1982: "The bill is mandatory rather than permissive. Further, it does not allow cities to deny second units on the basis of traffic impact or inadequate parking spaces." Similar concerns were voiced by the chief administrative officer of Culver City and the mayors of El Cerrito and Salinas.

might torture the word "construction" as used in Government Code section 65852.2, subdivision (b)(7) to make it include existing "construction" as well as proposed construction. But there is no way the words "any construction" can reasonably apply to existing buildings as well as proposed ones—to do so would make them mere surplusage. By definition any second unit is going to have been "constructed" some time. Therefore there would be no need to use the words "any construction" if they were intended to encompass what was already there. We reject an interpretation of a statute which unnecessarily renders some of its words meaningless. (E.g., *Carroll* v. *State Bar* (1985) 166 Cal.App.3d 1193, 1200 [213 Cal.Rptr. 305]; *Burks* v. *Monterey Regional Water Pollution Control Agency* (1984) 156 Cal.App.3d 1013, 1016 [203 Cal.Rptr. 368].)

The city counters by asking why should owners of existing second units, "knowing law breakers," be given a benefit which "forthright" applicants who propose new construction to create a second unit do not have. The answer to this question is because the Legislature says so. Whether the disparity furnishes an equal protection argument for such would-be "forthright" second unit owners we need not now decide.[14] For the moment it is enough to note the city makes no argument that either the state or federal Constitution forbids the preference for existing owners, and, if so, whether the remedy is to withdraw the preference from existing owners or extend it to new ones. We thus agree with the trial court that the city did not have the right to require additional parking from second unit applicants.

V

The city asks us to overturn the trial court's findings concerning its past conduct, asserting they are not supported by "any" substantial evidence. We can scarcely believe this argument is made with a straight face.

The picture that emerges from the evidence is one of administrative inertia, craftiness and circumlocution of virtually Dickensian dimensions. The fictional archbureaucrats Sir Humphrey Appleby[15] and Tite

---

[14]Suffice to say we can see a rational basis for the distinction. The marginal cost of supplying additional parking for property which already has a second unit may be prohibitive, or, particularly if the property is in an older area, physically impossible; on the other hand, if property requires substantial construction to create a second unit, the marginal cost of supplying additional parking is likely to be lower. Or, in plain English, "if you have to do a lot of work to make a second unit, you might as well add on a parking space while you're at it."

[15]See generally Lynn and Jay, The Complete Yes Minister (1981) (machinations of Permanent Under-Secretary of State in Department of Administrative Affairs).

Barnacle[16] would no doubt smile in appreciation of the city's classic tactics to avoid doing what it did not want to do:

—*Ignore it and it will go away.* The code compliance technician made it a practice never to tell any prospective applicant about the state law unless the applicant brought it up first.

—*Pretend it doesn't exist.* The letters and statements from the compliance technician and city attorney typically assumed there was only one alternative to "immediate" abatement of the second unit, phaseout under the amortization program.

—*When in doubt, mumble.*[17] The reference to the granny flat statute in the fact sheet is a masterpiece of hiding something in plain sight. While the fact sheet recognized the existence of the statute, it employed language so couched and tentative that an ordinary reader would think the statute was only tangentially related to second units.

—*Delay is the deadliest form of denial.*[18] The fact sheet wistfully mentioned a report on the granny flat statute that would be made the following year. The city manager actively discouraged applications because the city had not yet developed a way to process them. The message was: "the wheels of city government turn slowly, better agree to our phase-out program."

—*If all else fails, bury it with paper.* When Wilson applied under the granny flat statute, he was met with a submittal form, requesting a volume of information more appropriate for a high rise office or hotel complex than for a single homeowner living in a house, part of which had long ago been converted into second living quarters. The required information even included the botanical names of all "plant material" (bureaucratese for "plants") on his property. Wilson was then informed of the city's steadfast refusal to "process" his application until he coughed up this last farthing of information.

The city's actions follow a direct path to an overwhelming conclusion: the city was going to use every trick in the book to avoid complying with an

---

[16]See Dickens, Little Dorrit (Heritage Press 1956) at page 109 ("He wound and wound folds of white cravat round his neck, as he wound and wound folds of tape and paper round the neck of the country.").

[17]This is Boren's first law of bureacracy as cited in Dickson, The Official Rules (1978) at page 17.

[18]See Martin, Malice in Blunderland (1973) at page 85 (speaking of Parkinson's Law of Delay). See also Lynn and Jay, The Complete Yes Minister, *supra*, at page 93 (describing five-stage bureaucratic stalling technique as "Creative Inertia").

unwanted state law.[19] Such actions do not exactly inspire confidence in local government. The city appears to have chosen to ignore that state legislatures prevail over municipalities in the pecking order of governments. The trial court's findings against the city were not only supported by substantial, but by overwhelming, evidence.

## VI

■ The final question is whether the city's past conduct estops it from enforcing its new ordinance, Ordinance No. 1175, against those who were discouraged and misled so they may have an opportunity to do what they had a right to do in the first place. On this point we disagree with the trial court.

The court relied on a line of cases setting up stricter requirements for the government to be estopped than for a private party.[20] As stated in *Carty* v. *City of Ojai, supra,* 77 Cal.App.3d at page 341 (and quoted by the trial judge), estoppel "will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public.' "

The cases relied on reasoned that a city could not "contract away" or "give away" its police power. Neither a city nor its staff should be able to nullify a zoning law by a nonlegislative act, such as issuing a permit (*Magruder* v. *City of Redwood, supra,* 203 Cal. 665; *Pettitt* v. *City of Fresno, supra,* 34 Cal.App.3d 813) or agreeing to certain zoning (*Carty* v. *City of Ojai, supra,* 77 Cal.App.3d 329).

But these cases did not involve a situation where the city's zoning power had been *already* commandeered by the Legislature to serve a specific public purpose. Here, the Legislature simply made a flat-out value judgment that the public would be better served by the additional housing created by the approval of second units, even without extra parking, than would be served by allowing cities to condition approval on that extra parking. It is not for the courts to say the legislative choice serves the public less than the alternative.

---

[19]In Little Dorrit, *supra,* Dickens invented the Circumlocution Office to satirize the tendency of bureacracies to engage in affirmative *in*action: "Whatever was required to be done, the Circumlocution Office was beforehand with all the public departments in the art of perceiving—*how not to do it.*" (*Id.* at p. 102.)

[20]*Magruder* v. *City of Redwood* (1928) 203 Cal. 665 [265 P. 806]; *Page* v. *City of Montebello* (1980) 112 Cal.App.3d 658 [169 Cal.Rptr. 447]; *Carty* v. *City of Ojai* (1978) 77 Cal.App.3d 329 [143 Cal.Rptr. 506]; *Pettitt* v. *City of Fresno* (1973) 34 Cal.App.3d 813 [110 Cal.Rptr. 262]; *Markey* v. *Danville Warehouse & Lbr., Inc.* (1953) 119 Cal.App.2d 1 [259 P.2d 19]; *Lima* v. *Woodruff* (1930) 107 Cal.App. 285 [290 P. 480].

Thus the trial court's point that estoppel would only "harm the public rather than the [c]ity" is incorrect. This is equivalent to saying that *enforcing the state statute* would "harm" the public, an improper court nullification of the legislative decision.

The duty on the part of the city was ministerial: to process applications under the granny flat statute, and if those applications met the criteria set out in subdivision (b) of the statute, to approve them. Under the statute, the second unit owners were entitled to have their applications so processed. Accordingly, they have met the two traditional requirements for a writ of mandate: (1) a "clear, present (and usually ministerial) duty on the part of the respondent"; and (2) a "clear, present and beneficial right in the petitioner, to the performance of that duty." (See 8 Witkin, Cal. Procedure (3d. ed. 1985) Extraordinary Writs, § 65, pp. 702-703.)

In *Great Western Sav. & Loan Assn.* v. *City of Los Angeles* (1973) 31 Cal.App.3d 403 [107 Cal.Rptr. 359], a land developer sought a writ of mandate to compel a city to approve a final subdivision tract map. Because *state law* provided that the local governing body "shall" approve such a map if it met certain requirements, the court held the developer was entitled to a writ commanding the city to do what the state law said it shall do.

The same rule applies here. In this case subdivision (b) of the granny flat statute states the local government "shall" grant a special or conditional use permit if the second unit complies with its enumerated requirements. The second unit owners are therefore entitled to their writ.

The city regrettably refers to the second unit owners as "scofflaws" and "lawbreakers" who "did not want to take the few extra steps" to make "a few extra dollars" legally. It invokes the doctrine of unclean hands in arguing the second unit owners are not entitled to equitable relief because they have violated "duly enacted zoning laws" for the lowly motive of "personal economic profit."

The argument first disintegrates on the facts. The second unit owners are not, as the city argues, lawbreakers "by definition." The class, as defined by the trial court, consists of those second unit owners whose units have not "already been determined by the City to be a legal second unit." This is not the same thing as saying the class consists of owners of "illegal" second units. Just because the city has not determined a unit to be legal does not mean that it is not.

In point of fact, we have no way of knowing how many of the second units in South Laguna might be "illegal." Many, if not most of the units are

older dwellings predating 1960. The parties, however, have acknowledged that the Orange County Assessors Office has no records pertaining to South Laguna prior to 1950, and any records between 1950 and 1960 cannot be located. Perhaps this is one of the reasons the county, as distinct from the city, was somewhat more tolerant of South Laguna's second units when it had jurisdiction over the territory. For its part, the city's attitude has been that the owners have the burden of proving legality even though there may be no practical way to do so.[21]

The argument fares equally poorly on the law. There is no reasonable way to read the granny flat statute without concluding that the Legislature intended to confer on the owners of otherwise "illegal" second units an opportunity to "legalize" those units. To deny equitable relief to such owners precisely because their units violate zoning laws *otherwise modified by the statute* completely eviscerates the statute.

## VII

Our holding on the second unit owners' entitlement to a writ spares us the interesting question of whether, given Wilson's application, the city's new ordinance is itself valid under the granny flat statute, which requires a city to adopt its own ordinance within 120 days of the "first application" it receives under the statute after July 1, 1983. The trial court did not consider Wilson's application to be complete, and ruled that the 120-day period had therefore not yet begun to run prior to the adoption of the new city ordinance. Because, under our decision today, the second unit owners in the plaintiff class will have an opportunity to apply under the granny flat statute and not the new city ordinance, there is no need to explore the latter's validity.

The judgment is reversed and the cause remanded as to that portion denying the plaintiffs their requested writ of mandate. The judgment is affirmed as to those portions of it which are attacked by the city in its cross-appeal.

We hope this case does not represent a trend on the part of local agencies to circumvent both the spirit and letter of state law. California municipalities

---

[21]It is important to distinguish between the opportunity to obtain a permit under the granny flat statute and the opportunity to obtain a permit because the property was used legally prior to the enactment of a zoning ordinance. According to *City and County of San Francisco* v. *Board of Permit Appeals* (1989) 207 Cal.App.3d 1099, 1107 [255 Cal.Rptr. 307], "the burden is always on the party seeking to establish the nonconforming use to show that the use *did* preexist." Because the granny flat statute operates independently of the preexisting nonconforming use doctrine, we need not reach the issue of whether the second unit owners in South Laguna would have the burden of proving their units are "legal" under that doctrine.

are not fiefdoms unto their own. The governing bodies of cities are charged with the responsibility of *faithfully* executing the laws of the United States *and* State of California. Here, Laguna Beach spent considerable tax dollars in an effort to deprive some of its own citizens of the benefits clearly accorded them by a state law.

The trial court shall issue a writ ordering the city to process second unit applications under Government Code section 65852.2, subdivision (b) for a sufficient time to compensate for the period of the city's past erroneous refusal. We leave the determination of the precise amount of time up to the trial court. Obviously it must be long enough so that the writ cannot be circumvented by more bureaucratic delay. The trial court should retain continuing jurisdiction to assure compliance with its orders and also look favorably upon any applications for reference to a special master at the city's expense (Code Civ. Proc., § 639, subd.(c) [court may direct reference when question of fact arises in any stage of action]) in the event there are allegations that the city tries to subvert the granny flat statute in its processing of the applications contemplated in the writ of mandate. The plaintiffs shall recover their costs on the appeal and cross-appeal.

Moore, J., and Wallin, J., concurred.

A petition for a rehearing was denied June 5, 1992, and the petition of appellant City of Laguna Beach for review by the Supreme Court was denied August 13, 1992.